CLERKS OFFICE U.S. DIST. COURT
AT DANVILLE, VA
FILED

FEB 26 2024

LAURA A. AUSTIN, CLERK
BY: s/ H. MCDONALD
        DEPUTY CLERK

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
Danville Division

| | | |
|---|---|---|
| JOYCE C., | ) | |
| Plaintiff, | ) | Civil Action No. 4:22-cv-00122 |
| | ) | |
| v. | ) | REPORT & RECOMMENDATION |
| | ) | |
| MARTIN O'MALLEY | ) | By:    Joel C. Hoppe |
| Commissioner of Social Security, | ) | United States Magistrate Judge |
| Defendant. | ) | |

Plaintiff Joyce C. asks this Court to review the Commissioner of Social Security's

("Commissioner") final decision denying her application for supplemental security income

("SSI") under Title XVI of the Social Security Act, 42 U.S.C. §§ 1381–1383f. The case is before

me by referral under 28 U.S.C. § 636(b)(1)(B). Having considered the administrative record, the

parties' arguments, and the applicable law, I find that the Commissioner's denial of benefits is

not supported by substantial evidence. Accordingly, I respectfully recommend that the presiding

District Judge reverse the decision and remand the matter for rehearing under the fourth sentence

of 42 U.S.C. § 405(g).

## I. Standard of Review

The Social Security Act authorizes this Court to review the Commissioner's final

decision that a person is not entitled to disability benefits. 42 U.S.C. §§ 405(g), 1383(c)(3); *see

also Hines v. Barnhart*, 453 F.3d 559, 561 (4th Cir. 2006). The Court's role, however, is

limited—it may not "reweigh conflicting evidence, make credibility determinations, or substitute

[its] judgment" for that of agency officials. *Hancock v. Astrue*, 667 F.3d 470, 472 (4th Cir.

2012). Instead, a court reviewing the merits of the Commissioner's final decision asks only

whether the Administrative Law Judge ("ALJ") applied the correct legal standards and whether

substantial evidence supports the ALJ's factual findings. *Meyer v. Astrue*, 662 F.3d 700, 704 (4th

Cir. 2011); *see Riley v. Apfel*, 88 F. Supp. 2d 572, 576 (W.D. Va. 2000) (citing *Melkonyan v. Sullivan*, 501 U.S. 89, 98–100 (1991)).

"Substantial evidence" means "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971). It is "more than a mere scintilla" of evidence, *id.*, but not necessarily "a large or considerable amount of evidence," *Pierce v. Underwood*, 487 U.S. 552, 565 (1988). Substantial evidence review considers the entire record, and not just the evidence cited by the ALJ. *Universal Camera Corp. v. NLRB*, 340 U.S. 474, 487–89 (1951); *Gordon v. Schweiker*, 725 F.2d 231, 236 (4th Cir. 1984). Ultimately, this Court must affirm the ALJ's factual findings if "conflicting evidence allows reasonable minds to differ as to whether a claimant is disabled." *Johnson v. Barnhart*, 434 F.3d 650, 653 (4th Cir. 2005) (per curiam). However, "[a] factual finding by the ALJ is not binding if it was reached by means of an improper standard or misapplication of the law." *Coffman v. Bowen*, 829 F.2d 514, 517 (4th Cir. 1987).

A person is "disabled" within the meaning of the Act if he or she is unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. §1382c(a)(3)(A); *accord* 20 C.F.R. § 416.905(a).[1] Social Security ALJs follow a five-step process to determine whether a claimant is disabled. The ALJ asks, in sequence, whether the claimant (1) is working; (2) has a severe impairment that satisfies the Act's duration requirement; (3) has an impairment that meets or equals an impairment listed in the Act's regulations; (4) can return to his or her past relevant

---

[1] Unless otherwise noted, citations to the Code of Federal Regulations refer to the version in effect on the date of the Commissioner's final decision.

work based on his or her residual functional capacity; and, if not (5) whether he or she can perform other work. *Heckler v. Campbell*, 461 U.S. 458, 460–62 (1983); *Lewis v. Berryhill*, 858 F.3d 858, 861 (4th Cir. 2017); 20 C.F.R. § 416.920(a)(4). The claimant bears the burden of proof through step four. *Lewis*, 858 F.3d at 861. At step five, the burden shifts to the agency to prove that the claimant is not disabled. *Id.*

## II. Procedural History

This is Joyce's fifth time applying for disability benefits. *See* Administrative Record ("R.") 112–13. On July 28, 2020, she protectively filed this SSI claim alleging that she had been disabled since November 28, 2015, because of problems with her back and left hip, weak nerves on her right side, ringing in her ears (tinnitus), and cataracts with blurred vision.[2] R. 271. Joyce was sixty years old in July 2020, making her a person "closely approaching retirement age" under the regulations. R. 111; *see* 20 C.F.R. § 416.967(e). Virginia Disability Determination Services ("DDS"), the state agency, denied her claim initially in February 2021, R. 111–38, and upon reconsideration that July, R. 140–51. In March 2022, Joyce appeared with counsel and testified by telephone at a hearing before ALJ H. Munday. R. 33–44. A vocational expert ("VE") also testified. R. 38–56.

ALJ Munday issued an unfavorable decision on May 11, 2022. R. 12–25. She found that Joyce had the following severe medically determinable impairments ("MDI") after July 2020: "mild" chronic bilateral L5 radiculopathy; lumbar degenerative disc disease ("DDD"); obesity; and pulsatile tinnitus. R. 15. Her hypertension, bilateral cataracts, depression, and anxiety were

---

[2] Joyce's alleged disability onset date (November 28, 2015) is shortly after an ALJ denied her prior claim on November 23, 2015. *See* R. 81. Joyce's alleged onset date is not necessarily relevant to this decision because SSI benefits cannot be paid for any period before the month in which the claimant filed her SSI claim. The earliest month in which Joyce can establish "disability" for purposes of this SSI claim is July 2020. *See* R. 12, 37, 138; 20 C.F.R. §§ 416.202, 416.501.

non-severe MDIs. *Id.* Joyce's severe MDIs did not meet or medically equal the relevant Listings. R. 16 (citing 20 C.F.R. pt. 404, subpt. P, app. 1 §§ 1.15, 1.16, 2.10). ALJ Munday then evaluated Joyce's residual functional capacity ("RFC") based on all her medical impairments. *See* R. 16–24, 25. She found that Joyce could perform "light work"[3] as defined in the regulations; could "occasionally" stoop, kneel, crouch, crawl, and climb ramps and stairs, but never climb ladders, ropes, or scaffolds; and could tolerate "occasional exposure to vibrations." R. 16 (citing 20 C.F.R. § 416.967(b)). Joyce did not have any MDI-related limitations using her upper extremities or working around hazards. R. 16; *see* R. 23–24.

At step four, ALJ Munday found that Joyce's RFC allowed her to "perform her past relevant work as tobacco picker and sewing machine operator." R. 24; *see* R. 24–25 (citing R. 46–49, 282–83, 266–68). Specifically, Joyce could have gone back to work as a sewing-machine operator as that job is generally performed in the national economy, and she could have gone back to work as a tobacco picker either as she actually performed that job or as it is generally performed in the national economy. R. 25 (citing R. 46–49, 286–87). Based on those findings, ALJ Munday concluded that Joyce was not disabled from July 28, 2020, through May 11, 2022. *Id.* She did not reach an alternative conclusion at step five as to whether Joyce could do other work existing in the national economy based on her RFC and vocational profile. *See id.* The Appeals Council declined to review ALJ Munday's decision, R. 1–3, and this appeal followed.

### III. Discussion

---

[3] "Light work involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds. Even though the weight lifted may be very little, a job is in this [physical exertion] category when it requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls. To be considered capable of performing a full or wide range of light work, [the claimant] must have the ability to substantially all of these activities." 20 C.F.R. § 416.967(b).

Joyce's arguments challenge ALJ Munday's RFC finding that she could do "light work," *see* R. 16, 18, 23–24, and had no impairment-related limitations on her ability to reach, *see* R. 16, 24. *See generally* Pl.'s Br. 5–9 (medical opinion analysis), 9–10 (daily activities), 10–14 (symptoms analysis), ECF No. 16. First, she argues that the ALJ improperly rejected PA Morgan Jackson's medical opinion that she should be limited to four hours of walking in an eight-hour workday and to "occasional" reaching with either arm. *See id.* at 7–9 (citing R. 24, 651–52). Second, Joyce asserts that the ALJ "ignored" evidence demonstrating her "minimal" daily activities when determining her RFC. *See id.* at 9–10 (citing R. 17–18, 24). Finally, she challenges the ALJ's reasons for finding that her statements describing the intensity, persistence, and physically limiting effects of her chronic back and leg pain were not entirely consistent with the medical and other evidence in her record. *See id.* at 11–13 (citing R. 22). Each objection has some merit.

\*

A claimant's RFC is her "maximum remaining ability to do sustained work activities in an ordinary work setting" for eight hours a day, five days a week despite her MDIs and related symptoms. SSR 96-8p, 1996 WL 374184, at \*2 (July 2, 1996) (emphasis omitted). It is a factual finding "made by the [ALJ] based on all the relevant evidence in the case record," *Felton-Miller v. Astrue*, 459 F. App'x 266, 230–31 (4th Cir. 2011), including objective medical evidence, medical-source opinions, and the claimant's statements, 20 C.F.R. § 416.945(a), (e). *See, e.g.*, *Patterson v. Comm'r of Soc. Sec. Admin.*, 846 F.3d 656, 659 (4th Cir. 2017) ("This RFC assessment is a holistic and fact-specific evaluation" made after the ALJ "evaluate[s] 'all' relevant record evidence" (quoting 20 C.F.R. § 404.1520(e)). The RFC finding should reflect all credibly established "restrictions caused by medical impairments and their related symptoms"

that impact the claimant's functional "capacity to do work-related physical and mental activities" on a regular and continuing basis. SSR 96-8p, 1996 WL 374184, at *1–2; *see Mascio v. Colvin*, 780 F.3d 632, 637–40 (4th Cir. 2015).

The Commissioner "has specified the manner in which an ALJ should assess a claimant's RFC." *Thomas v. Berryhill*, 916 F.3d 307, 311 (4th Cir. 2019). First, because RFC is by definition "a function-by-function assessment based upon all of the relevant evidence of [the claimant's] ability to do work related activities," SSR 96-8p, 1996 WL 374184, at *3, the ALJ must actually identify each impairment-related functional limitation supported by the record. *See Monroe v. Colvin*, 826 F.3d 176, 179 (4th Cir. 2016). Second, the ALJ must provide a "narrative discussion describing" how specific medical facts and non-medical evidence "support[] each conclusion" in the RFC assessment, SSR 96-8p, 1996 WL 374184, at *7, and logically explaining how she weighed any conflicting or inconsistent evidence in arriving at those conclusions, *Thomas*, 916 F.3d at 311. Generally, a reviewing court will affirm the ALJ's RFC findings when she considered all the relevant evidence under the correct legal standards, *see Brown v. Comm'r of Soc. Sec. Admin.*, 873 F.3d 251, 268–72 (4th Cir. 2017), and her written decision builds an "accurate and logical bridge from that evidence to h[er] conclusion[s]," *Woods v. Berryhill*, 888 F.3d 686, 694 (4th Cir. 2018), *superseded on other grounds as recognized in Rogers v. Kijakazi*, 62 F.4th 872 (4th Cir. 2023). *See, e.g.*, *Thomas*, 916 F.3d at 311–12.

ALJ Munday's decision does not satisfy this deferential standard of review. To start, she did not "identify [Joyce's] functional limitations" sustaining specific strength demands of work, SSR 96-8p, 1996 WL 374184, at *1, including "standing, walking, lifting, carrying, pushing, [or] pulling," 20 C.F.R. § 416.945(b). *See generally* R. 15–24. The ALJ's "RFC assessment must first identify the individual's functional limitations or restrictions and assess his or her work-related

abilities on a function-by-function basis, including the functions in" 20 C.F.R. § 416.945(b)–(d),

before the ALJ can express her RFC finding "in terms of exertional levels of work" like "light,

medium, [or] heavy." SSR 96-8p, 1996 WL 374184, at *1. Here, the ALJ simply concluded that

Joyce's RFC allowed her to do "light work as defined in" the regulations. R. 16 (citing 20 C.F.R.

§ 416.967(b)).

An ALJ's failure to "perform an explicit function-by-function analysis" does not always

require remand. *Mascio*, 780 F.3d at 636 ("[A] per se rule is inappropriate given that remand

would prove futile in cases where the ALJ does not discuss functions that are irrelevant or

uncontested" (internal quotation marks omitted)). But, reversal and remand are "appropriate

where an ALJ fails to assess a claimant's capacity to perform relevant functions, despite

contradictory evidence in the record, or where other inadequacies in the ALJ's analysis frustrate

meaningful review." *Id.* (cleaned up). This ALJ's written decision contains both errors.

For example, despite finding that Joyce could "perform light work" as defined in the

regulations, R. 16, the ALJ later described her RFC as "consistent with a *limited range* of light

work," R. 23 (emphasis added), and twice noted that Joyce could sustain "*most* light work tasks"

even if she did not have the "stamina for medium or heavy work tasks,"[4] R. 24 (emphasis

added); *accord* R. 18 (concluding that Joyce could not do "medium work and more strenuous

tasks," but that "most light work tasks would be feasible" for her). A *full range* of light

exertional work requires the physical strength (on a sustained basis) to lift up to twenty pounds at

---

[4] "Medium work involves lifting no more than 50 pounds at a time with frequent lifting or carrying of objects weighing up to 25 pounds." 20 C.F.R. § 416.967(c). "Heavy work involves lifting no more than 100 pounds at a time with frequent lifting or carrying of objects weighing up to 75 pounds." *Id.* § 416.967(d). If someone can do heavy or medium work, they can also do light work. *See id.* Both light work and medium work typically require standing and/or walking for about six hours during an eight-hour workday. *See, e.g.*, *Woods*, 888 F.3d at 694 (medium work); *Neal v. Astrue*, Civ. No. JKS-09-2316, 2010 WL 1759582, at *2 (D. Md. Apr. 29, 2010) (light work).

one time, frequently lift or carry objects weighing up to ten pounds, 20 C.F.R. § 416.967(b), and

"stand or walk for up to six hours per [eight-hour] workday or 'sit most of the time with some

pushing and pulling of arm or leg controls,'" *Neal*, 2010 WL 1759582, at *2 (quoting 20 C.F.R.

§ 404.1567(b)). *See generally* 20 C.F.R. § 416.967(c) ("To be considered capable of performing

a full or wide range of light work, you must have the ability to do substantially all of these

[seven] activities."); SSR 96-8p, 1996 WL 374184, at *5 (listing the "seven strength demands"

of exertional work). An RFC for a "limited range of light work" might further restrict the

claimant to standing or walking for only four hours during an eight-hour workday, or reduce her

weightlifting requirements from twenty pounds to fifteen pounds. *See, e.g.*, *Tolbert v. Berryhill*,

No. 1:17cv14, 2018 WL 2347096, at *6 (W.D. Va. May 23, 2018) (lifting fifteen pounds); *Neal*,

2010 WL 1759582, at *2 (standing/walking four hours). An RFC for "light work" that merely

limits the claimant's ability to climb ladders or work around vibrations, *see* R. 16, on the other

hand, would still allow the claimant to do a full range of light exertional work because climbing

and workplace conditions are "nonexertional" functions. *See generally* SSR 96-8p, 1996 WL

374184, at *5–6. They do not relate to the physical strength needed to do light exertional work.

*See id.*; 20 C.F.R. § 416.967(b).

Nothing in this ALJ's written decision suggests that she intended to limit Joyce's strength

capacities beyond what light exertional work demands. *See* R. 16, 18, 22–24. On the contrary,

the ALJ's decision to limit Joyce to "light" work because her "stamina for medium or heavy

work tasks may be limited by her back pain and other severe impairments," R. 24; *see also* R. 18,

implies that the ALJ intended to reduce Joyce's weightlifting requirements, but not her capacities

for standing or walking. *See* 20 C.F.R. § 416.967(b)–(d). Light work, medium work, and heavy

work each have their own weightlifting requirements, with light work being the least physically

demanding. *Id.* All three exertional levels of work typically require standing and/or walking for six hours in an eight-hour workday. *Woods*, 888 F.3d at 694; *Neal*, 2010 WL 1759582, at *2. Accordingly, the ALJ's actual RFC finding, R. 16, is most consistent with the full range of light work, including the requirement that Joyce stand and/or walk for a total of six hours a day, five days a week. *See Neal*, 2010 WL 1759582, at *2.

This ALJ's decision is also missing a "narrative discussion describing" how specific medical facts and non-medical evidence "support[] each conclusion" in her exertional RFC determination. SSR 96-8p, 1996 WL 374184, at *7. She concluded that Joyce could do light work and "summarized evidence that [s]he found credible, useful, and consistent," *Woods*, 888 F.3d at 694. *See* R. 17, 23, 24. "But the ALJ never explained how [s]he concluded—*based on this evidence*—that [Joyce] could actually perform the tasks required by '[light] work,'" let alone for a full workday, *Woods*, 888 F.3d at 694; *see Mascio*, 780 F.3d at 637. Her only fact-specific analysis of Joyce's exertional RFC is just two sentences long:

> The claimant has, at times, demonstrated pain behaviors and she has continually complained of pain and balance difficulties, but, objectively, she has exhibited normal gait without the use of an assistive device, as well as normal strength, sensation, reflexes, and coordination. ([R. 538, 659, 667–68, 671–72, 676, 688–89, 920]). Based on this information [the ALJ] has determined that the claimant can perform most light work tasks.

R. 23; *see* R. 24 ("[T]he claimant has the above [RFC] assessment, which is supported by her reported symptoms, limitations, and daily activities, as well as her imaging of record, course of treatment, and clinical exams. This evidence, considered in combination, indicates that the claimant's stamina for medium or heavy work tasks may be limited by her back pain and other severe impairments but she remains capable of most light work tasks."). This terse discussion does not explain how the ALJ concluded (albeit implicitly) that Joyce could actually lift up to twenty pounds or stand and/or walk for six hours in an eight-hour workday. "The ALJ therefore

failed to build an accurate and logical bridge from the evidence [s]he recounted to [her] conclusion about [Joyce's] residual functional capacity." *Woods*, 888 F.3d at 694. The Commissioner should remedy this error on remand.

This brings us to Joyce's specific challenges to how this ALJ evaluated conflicting evidence in concluding that Joyce could do a full range of light work and had no MDI-related limitations on her ability to reach. *See generally* Pl.'s Br. 5–9 (medical opinion analysis), 9–10 (daily activities), 10–14 (symptoms analysis).

A.    *Medical Opinions*

   1.    *The Legal Framework*

"Medical opinions"—i.e., statements from a medical source about what the claimant "can still do despite" her MDIs and whether she has "impairment-related limitations or restrictions" meeting specific demands of work, 20 C.F.R. § 416.913(a)(2), can be critical to a proper RFC analysis. *See, e.g.*, *Oakes v. Kijakazi*, 70 F.4th 207, 212–15 (4th Cir. 2023). The regulations specify "how [ALJs] consider medical opinions" as part of the disability determination and "how [they] articulate" certain findings in their written decisions. 20 C.F.R. § 416.920c (SSI claims filed on or after March 27, 2017). First, ALJs "will not defer or give any specific evidentiary weight, including controlling weight, to any medical opinion(s)" in the claimant's record. *Id.* § 416.920c(a). Instead, ALJs "will consider [all] medical opinions . . . using the factors listed in [subparagraphs] (c)(1) through (c)(5) . . . , as appropriate." *Id.*; *see Oakes*, 70 F.4th at 212. Second, ALJs "will articulate . . . how persuasive [they] find all of the medical opinions" in the record. 20 C.F.R. § 416.920c(b). ALJs should "articulate how [they] considered the medical opinions . . . from [each] medical source together in a single analysis using the factors listed in [subparagraphs] (c)(1) through (c)(5) . . . , as appropriate." *Id.*

These persuasiveness factors include: "(1) supportability; (2) consistency; (3) a physician's relationship with the claimant; (4) a physician's specialization; and (5) other factors, like the source's familiarity with the evidentiary record." *See Oakes*, 70 F.4th at 212 (citing 20 C.F.R. § 404.1520c(c)(1)–(5)). The first two factors—supportability and consistency—"are the most important factors [ALJs] consider when [they] determine how persuasive [they] find a source's medical opinions . . . to be. Therefore, [ALJs] will explain how [they] considered the supportability and consistency factors for [each] medical source's medical opinions." 20 C.F.R. § 416.920c(b)(2); *see Cothran v. Kijakazi*, No. 21-2337, 2022 WL 5434323, at *1 (4th Cir. Oct. 7, 2022) (citing 20 C.F.R. § 404.1520c (2022)). Supportability and consistency are distinct legal considerations. *See* 20 C.F.R. § 416.920c(c)(1), (2). "Supportability" requires ALJs to consider "the objective medical evidence and . . . explanations *presented by* [the] medical source . . . to support his or her [own] medical opinion(s)," 20 C.F.R. §, 416.920c(c)(1) (emphasis added). *See Oakes*, 70 F.4th at 212. "Consistency" requires ALJs to compare that source's medical opinions to "evidence *from other* medical and nonmedical sources" in the claimant's record, 20 C.F.R. § 416.920c(c)(2) (emphasis added). *See Oakes*, 70 F.4th at 212. The regulation requires ALJs to "explain how [they] considered" *both* supportability *and* consistency when articulating in their written decision how persuasive they found each source's medical opinions to be in making the disability determination. 20 C.F.R. § 416.920c(b)(2).

Ordinarily, ALJs "are not required to[] explain how [they] considered the [other] factors," such as the source's relationship with the claimant, when determining or articulating how persuasive they found that source's medical opinions to be. *Id.* An exception applies when they "find that two or more medical opinions . . . about the same issue are both equally well-supported and consistent with the record but are not exactly the same." *Id.* § 416.920c(b)(2) (parenthetical

citations omitted). In that case, ALJs "will articulate how [they] considered the other most

persuasive factors . . . for those medical opinions." *Id.* (citing *id.* § 416.920c(c)(3)–(5)).

As always, the ALJ's decision must build an accurate and "logical bridge between the

evidence and the ALJ's conclusion that [a medical] opinion," *Oakes*, 70 F.4th at 214, is or is not

"persuasive" evidence of the claimant's allegedly disabling medical condition(s), *see id.* at 212–

13. When the court is "'left to guess' as to how the ALJ reached her evaluation of the conflicting

medical opinions in light of the evidence of record," then it cannot "review the reasonableness of

her conclusions," *Testamark v. Berryhill*, 736 F. App'x 395, 398 (4th Cir. 2018) (quoting

*Mascio*, 780 F.3d at 638), about the claimant's RFC. *See Mascio*, 780 F.3d at 638. And a court

that "cannot gauge the propriety of the ALJ's RFC assessment, [also] cannot say that substantial

evidence supports the ALJ's denial of benefits." *Patterson*, 846 F.3d at 662.

2.    *Summary*

Joyce's arguments focus on the ALJ's analysis of medical opinions from Morgan

Jackson, P.A., who examined Joyce for DDS in January 2021, R. 647–62, and from the two DDS

physicians who reviewed Joyce's medical records in February 2021 and July 2021, respectively,

R. 127–34, 147–50. *See* Pl.'s Br. 7–9 (citing R. 23–24). She argues that the ALJ's reason for

rejecting PA Jackson's opinion that Joyce could only "occasionally" reach with both arms is

contradicted by the medical record and that the ALJ did not explain why she implicitly credited

the DDS physicians' opinions that Joyce could stand and/or walk for about six hours during a

normal workday over PA Jackson's opinion that she could walk for only four hours. *See id.* I

agree. ALJ Munday did not follow the regulation's mandatory language, 20 C.F.R. §

416.920c(b)–(c), when evaluating any of those medical opinions. *See* R. 23–24. These clear legal

errors require reversal and remand. *Cf. Patterson*, 846 F.3d at 661–62 (concluding that an ALJ's

failure to apply a "regulation with mandatory language" will rarely, if ever, be harmless error because "such a failure prevents, or at least substantially hinders, judicial review").

*

Joyce saw PA Jackson for a consultative physical exam on January 23, 2021. R. 647. She "complain[ed] of back pain worsening for the past 10 years. The pain [was] consistently in her upper thoracic spine and left lower back, but it [could] extend to her whole back on some days." *Id.* Pain, joint stiffness, weakness, neuropathy, swelling, and "lack of balance" were making it increasingly more difficult for Joyce to pick things up off the floor and climb the stairs in her home. R. 647–48. She could still do basic activities of daily living, including bathing, dressing, cleaning, doing dishes, and vacuuming. R. 647.

PA Jackson observed that Joyce got up from the waiting-room chair independently and sat comfortably during the exam. R. 648. She exhibited normal station and base of support, but she walked with an antalgic gait. R. 649. Joyce could walk on her heels and toes and in tandem, and she did not use an assistive device. *Id.* She exhibited decreased strength (4/5) in all four extremities, including both shoulders, hips, and knees. R. 650. Her range of motion was normal throughout except in her shoulders. R. 650–51. Both shoulders had reduced forward flexion (130/150) and abduction (110/150), but backward extension, adduction, external rotation, and internal rotation were all within normal limits. *Id.* PA Jackson's exam of Joyce's joints revealed left acromioclavicular ("AC") joint tenderness and right superior shoulder tenderness; positive straight leg raise on the left, but negative on the right; upper thoracic and lumbar midline tenderness; and paraspinal thoracic tenderness bilaterally. R. 651. Her other findings were unremarkable. *See id.* A recent X-ray of Joyce's lumbar spine showed "moderate degenerative changes" and "grade 1 anterolisthesis [at] L4 on L5" without acute osseous injury. R. 568 (Jan.

13

4, 2021). The degenerative changes were "stable" compared to a lumbar X-ray from August

2018. *Id.*; *see* R. 133–34.

PA Jackson diagnosed Joyce with back pain, dyspnea, and tinnitus. R. 651 She also

completed a Functional Assessment & Medical Source Statement evaluating Joyce's work-

related abilities and limitations "based on the review of records, [Joyce's] history, and today's

physical exam." *Id.*; *see* R. 651–52. She opined that Joyce could "frequently" carry up to ten

pounds, but only "occasionally" lift the same amount of weight; "occasionally" lift and/or carry

objects weighing eleven pounds to twenty pounds; and "never" lift or carry anything weighing

more than twenty pounds.[5] R. 651. During an eight-hour workday, Joyce could sit for about eight

hours, stand for about six hours, and walk for about four hours. R. 652. She did not need an

assistive device to ambulate. *Id.* Joyce could frequently handle and feel bilaterally, but she

should be limited to only occasional reaching and grasping with either upper extremity. She

could occasionally bend, stoop, kneel, and squat. *Id.*

Donald Williams, M.D., reviewed Joyce's records for DDS in February 2021. *See* R.

124–34. Dr. Williams opined that Joyce had two "severe" physical MDIs affecting her lumbar

spine and major joints in the lower extremities, *See* R. 127, 131, 133–34, but that those MDI did

not prevent her from doing "light work," R. 134. *See* R. 131–32. During an eight-hour workday,

Joyce could frequently lift, carry, push, and/or pull ten pounds and occasionally lift, carry, push,

and/or pull twenty pounds; sit for about six hours with normal breaks; stand and/or walk for

---

[5] PA Jackson's medical opinion does not define the terms "frequently" and "occasionally." *See* R. 651–
52. The first DDS physician's medical opinion defines "frequently" as doing a work-related activity for
"cumulatively more than 1/3 up to 2/3 of an 8 hour day" and defines "occasionally" as doing the activity
for "cumulatively 1/3 or less of an 8 hour day." R. 131. The Commissioner's rules define "frequent" and
"occasional" using similar terms. *See, e.g.*, SSR 83-10, 1983 WL 31251, at *5, *6 (Jan. 1. 1983)
("'Occasionally' means occurring from very little up to one-third of the time. . . . [and] should generally
total no more than about 2 hours of an 8-hour workday." "'Frequent' means occurring from one-third to
two-thirds of the time . . . [or] a total of approximately 6 hours of an 8-hour workday.").

about six hours with normal breaks; and occasionally climb, balance, stoop, kneel, crouch, and/or crawl. R. 131–32. She should avoid concentrated exposure to workplace hazards like moving machinery and heights. R. 133. Dr. Williams based these functional limitations on Joyce's lumbar DDD, neuropathy, and tinnitus. *Id.*; *see also* R. 133–34 (citing R. 538–39, 568, 648–51). Unlike PA Jackson, he did not restrict Joyce's capacities for reaching, grasping, handling, or feeling. *Compare* R. 132, *with* R. 652.

William Rutherford Jr., M.D., reviewed Joyce's updated records for DDS in July 2021. *See* R. 144–50. He affirmed Dr. Williams's RFC for light work with no manipulative restrictions, but opined that Joyce was not as limited in some of her postural and environmental capacities as Dr. Williams had indicated. R. 148–49. Dr. Rutherford opined that Joyce could frequently climb ramps/stairs, balance, stoop, kneel, and crouch, and occasionally crawl and climb ladders, ropes, or scaffolds. R. 149. He based these limitations on Joyce's lumbar DDD, neuropathy, and tinnitus. R. 149. Unlike Dr. Williams, Dr. Rutherford did not restrict her exposure to workplace hazards. R. 150. Both DDS physicians opined that Joyce could tolerate "unlimited" exposure to vibrations. R. 133; *accord* R. 150.

3.      *Analysis*

ALJ Munday considered all three medical opinions as part of her RFC assessment. *See* R. 23–24. She characterized the DDS physicians' opinions as permitting "a limited range of light work," and noted that the two opinions were not exactly the same regarding Joyce's capacities to climb ramps/stairs, balance, stoop, kneel, crouch, and work around hazards. R. 23. But the ALJ never articulated "how persuasive," 20 C.F.R. § 416.920c(b), she found either Dr. Williams's or Dr. Rutherford's medical opinions to be. R. 23–24. Indeed, terms "persuasive," "supportability," and "consistency" appear nowhere in her terse discussion of this evidence. R. 23; *see* 20 C.F.R. §

416.920c(b)(2). She simply noted her finding that "the record [was] consistent with a limited

range of light work," and stated that her own RFC finding "deviated from" the DDS physicians'

opinions "in minor ways based on [Joyce's] hearing testimony." R. 23 (citing R. 292–99, 318,

324–31).[6] Section 416.920c required the ALJ to do much "more than simply acknowledge the

existence of [these] opinion[s]," *Dowling v. Comm'r of Soc. Sec. Admin.*, 986 F.3d 377, 384 (4th

Cir. 2021) (applying 20 C.F.R. § 404.1527). *See* 20 C.F.R. § 416.920(b)–(c). Her failure to

follow that regulation's mandatory language is reversible legal error. *See Dowling*, 986 F.3d at

384; *Patterson*, 846 F.3d at 661–62.

The ALJ's actual RFC finding, R. 16, reflects aspects of both DDS physicians' medical

opinions, including their shared opinion that Joyce could meet all the strength demands of light

work, R. 131, 149. It incorporates Dr. Williams's opinion that Joyce could "occasionally" climb

ramps/stairs, balance, stoop, kneel, crouch, and/or crawl, R. 16, 131–32, without any explanation

as to why Joyce could not do these things "frequently," like Dr. Rutherford thought she could, R.

149. *See* 20 C.F.R. § 416.920c(b)(3). But the RFC finding also omits Dr. Williams's limitation

on working around hazards, *see* R. 16, 132, making it more consistent with Dr. Rutherford's

opinion in that respect, R. 150. Again, the ALJ did not explain why one opinion prevailed over

the other on this particular issue. *See* 20 C.F.R. § 416.920c(b)(3). The ALJ's RFC finding also

includes two limitations that neither DDS physician had proposed based on his review of Joyce's

medical records. The ALJ explained that she eliminated all climbing ladders/ropes/scaffolds and

restricted Joyce's exposure to vibration "based on [her] recently reported balance difficulties"

and "ongoing issues with tinnitus." R. 23 (citing R. 292–99, 318, 324–31). Notably, she did not

---

[6] The cited records contain written statements that Joyce made to DDS in August 2020 and May 2021.
For the most part, those statements describe how back pain limits her abilities to lift, carry, sit, stand, and
walk. *See, e.g.*, R. 292, 297–98, 324, 329.

explain why Joyce's balance problems would not *also* limit her ability to work around hazards like moving machinery, as Dr. Williams opined on initial review.[7] R. 133.

The ALJ also considered PA Jackson's medical opinion as part of the RFC assessment. R. 24. She accurately summarized most of its contents, including that Joyce could "occasionally" lift up to twenty pounds; could "frequently" carry ten pounds; could stand for six hours and walk for four hours during an eight-hour day; could frequently handle and feel, but only occasionally reach and grasp, with both upper extremities; could occasionally bend, stoop, kneel, and squat; and did not need an assistive device to walk. *Id.*; *see* R. 651–52.

The ALJ found that PA Jackson's opinion was "generally persuasive [to her] determination." R. 24. After stating that finding, she highlighted some of PA Jackson's mixed "direct observations" from Joyce's physical exam, including that she walked with "an antalgic gait but did not use or need an assistive device" and that she "exhibited mildly decreased strength . . . , but she otherwise exhibited intact range of motion and sensation throughout the extremities, major joints, and spine." *Id.* (citing R. 649–51). The ALJ referenced PA Jackson's other abnormal findings earlier in her decision, R. 19 (citing R. 651), but none of those findings appear on her list of "direct observations" that ostensibly supported PA Jackson's proposed limitations, R. 24. The other abnormal findings included "decreased ROM with bilateral shoulder flexion and abduction," left AC joint tenderness and right superior shoulder tenderness, positive straight leg

---

[7] The ALJ's failure to include a hazards limitation in the RFC finding, R. 16, appears to have played an outcome-determinative role in her step-four finding that Joyce's RFC still allowed her to do her past work as a sewing-machine operator or tobacco picker, R. 24–25. *See, e.g.*, R. 38 (ALJ: "[T]he past work, in my opinion, [is] going to be outcome determinative."); R. 49 (ALJ: "If I take out the hazards limitation, all the past work remains. Is that correct?" VE: "Yes."). The ALJ denied Joyce's SSI claim at step four. R. 24–25. Had Joyce prevailed at that step, however, the record contains enough evidence to support a conclusion at step five that Joyce's age category and vocational profile rendered her "disabled" even if she could still do a full range of light work. *See, e.g.*, R. 37–38, 49–50, 111, 272–73; *see generally* 20 C.F.R. pt. 404, subpt. P, app. 2 §§ 202.00(f), 202.01 to 202.06. The ALJ did not make any factual findings relevant to the step-five determination. R. 24–25.

test on the left, "upper thoracic and lumbar midline tenderness," and bilateral paraspinal thoracic tenderness." R. 651.

The ALJ concluded that "these direct observations"—i.e., the ones she listed in her analysis—"support[ed] the assessed limitations in [PA] Jackson's opinion," except those related to Joyce's upper extremities. R. 24; *see* 20 C.F.R. § 416.920c(c)(1). But the ALJ did not explain how she reached that conclusion, and her actual RFC finding, R. 16, appears to contradict it. For example, the ALJ's conclusion indicates PA Jackson's observations that Joyce's had an antalgic gait and 4/5 lower-extremity strength supported all of PA Jackson's exertional limitations, R. 24 (citing R. 649–50), but her RFC finding does not restrict Joyce to standing for six hours and walking for "four hours total in and eight-hour day," R. 24 (citing R. 652).[8] *See* R. 16. The ALJ should explain why she rejected a limitation that she otherwise found supported by the source's relevant observations on exam. *See* 20 C.F.R. § 416.920c(c)(1) ("The more relevant the objective medical evidence and supporting explanations presented by a medical source are to support his or her medical opinion(s) . . . , the more persuasive the medical opinions . . . will be."); *cf. Warren v. Astrue*, No. 2:08cv3, 2008 WL 3285756, at *11 (W.D. Va. Aug. 8, 2008) ("The ALJ's decision cannot be supported by substantial evidence when he fails to adequately explain his rationale for rejecting the opinions of those whom he otherwise gave great weight to in arriving at his decision.").

The ALJ also failed to mention—let alone explain how she considered—the consistency factor in concluding that PA Jackson's opinion was "generally," but not entirely, persuasive. R.

---

[8] Joyce correctly notes that the ALJ also did not acknowledge that PA Jackson's medical opinion on this issue is not exactly the same as the DDS physicians' medical opinions, both of which indicate that Joyce could stand and/or walk (with normal breaks) for about six hours during an eight-hour workday. Pl.'s Br. 8; *see* R. 23–23, 131, 149, 652; 20 C.F.R. § 416.920c(b)(3).

24; *see* 20 C.F.R. § 416.920c(b)(2), (c)(2). On the supportability factor, the ALJ found that PA

Jackson cited "no supportive observations" for limiting Joyce's capacities to reach, grasp,

handle, or feel bilaterally. R. 24; *see* 20 C.F.R. § 416.920c(c)(1). She stated that PA Jackson

"noted that [Joyce] had normal dexterity in hands and wrists and *full range of motion* in the

cervical spine *and shoulders*," and concluded that these normal findings were "[c]ontrary to this

portion" of the opinion. R. 24 (emphasis added). The ALJ's characterization of PA Jackson's

findings is not accurate. In fact, PA Jackson noted equally decreased ranges of motion in both

shoulders on abduction (110/150) and forward flexion (130/150), as well as tenderness to

palpation of both the left AC joint and the right superior shoulder. R. 650–51. Those undisputed

findings could support PA Jackson's opinion that Joyce had decreased capacity to reach with

either arm, even if she was not as limited as PA Jackson indicated. *See* 20 C.F.R. §

416.920c(c)(1); *cf. Hines*, 453 F.3d at 566 ("The deference accorded an ALJ's findings of fact

does not mean that we credit even those findings contradicted by undisputed evidence."). Thus,

the ALJ's written decision fails to build an accurate and logical bridge from the evidence she

cited to her conclusion that PA Jackson's observations contradicted this portion of her opinion.

*See Oakes*, 70 F.4th at 214.

     The ALJ also found that Joyce "ha[d] exhibited intact strength and coordination

throughout the record," R. 24 (citing R. 538, 659, 667–68, 671–72, 676, 688–89, 920), thus

"supporting *no limitation* in the use of her upper extremities for reaching" or any other work-

related activities. *Id.* (emphasis added). With one exception, the cited records do show full

muscle strength and intact coordination on exams in 2020 and 2021. *See* R. 538, 659, 667–68,

671–72, 676, 920. The other record does not contain findings on those points. R. 688–89. But, it

does show Joyce complained of arm pain, joint pain, and muscle weakness and that she was

19

"very rigid in her spine with poor mobility, poor . . . flexion and extension[,] and pain [with]

motion and tenderness" on that day's exam. R. 688–89 ("[P]atient is guarding her back moves

very poorly cannot get up and down out of chair comfortably and does this with extreme

caution."). The ALJ did not explain how any of the records she cited support her conclusion that

Joyce had "no limitations" reaching with either upper extremity. *See* R. 24.

"The missing analysis is especially troubling because the record contains conflicting

evidence" about Joyce's capacity to do that work-related function—"evidence that the ALJ did

not address," *Mascio*, 780 F.3d at 637. To start, the ALJ's threshold findings as to the nature,

severity, and functionally limiting effects of Joyce's physical MDIs relate mostly to her lumbar

spine disorder and resulting lower-back pain with radicular pain and neuropathy in the lower

extremities. *See* R. 15–18, 22. She did not find that Joyce had an MDI specifically related to the

thoracic spine or upper extremities. R. 15.

Joyce frequently complained of pain in her neck, thoracic spine, and/or shoulder(s), R.

372, 379, 404, 408, 468–69, 686, 688, 860, and the record contains objective medical evidence

of abnormalities in her thoracic spine and shoulder that could limit her ability to reach, R. 376,

469, 650–51, 861–62. *See generally* 20 C.F.R. §§ 416.921, 416.922(a)–(b)(1). For example,

three different examiners noted reduced range of motion in her shoulders and/or tenderness to

palpation of the muscles around her upper thoracic spine. R. 469, 650–51, 861–62. In April

2020, she was diagnosed with neck pain and cervicalgia. R. 467. A year later, she was diagnosed

with a right trapezius strain based on an abnormal physical exam and normal shoulder X-rays. R.

862–63. Diagnostic images show "[m]ild dextroscoliosis of the thoracic spine," R. 376, in

addition to the lumbar spine disorder that the ALJ focused on in her decision. At the very least,

the abnormal findings on physical exams and diagnostic images could establish the existence of

an MDI that caused *some* limitation in Joyce's physical ability to use her upper extremities. *See*

20 C.F.R. §§ 416.921, 416.922(a)–(b)(1). The ALJ did not explain why she failed to find such an

impairment. *See* R. 15.

Moreover, it is not clear that the ALJ considered these objective abnormalities, along

with Joyce's full strength and normal coordination, when concluding Joyce had "no limitations"

using her upper extremities to reach. R. 24. An ALJ evaluating a disability claim must "consider

all relevant medical evidence and cannot simply cherry pick facts that support a finding of

nondisability while ignoring evidence that points to a disability finding." *Arakas v. Comm'r, Soc.*

*Sec. Admin.*, 983 F.3d 83, 98 (4th Cir. 2020) (cleaned up). This ALJ denied Joyce's SSI claim

because she found that Joyce's RFC allowed her to go back to work as a sewing-machine

operator (DOT 787.682-066), as that job is generally performed, or as tobacco picker (DOT

521.687-098), either as Joyce actually performed that job or as it is generally performed. R. 25

(citing R. 46–49, 286–87). Being a sewing-machine operator would require Joyce to reach

"constantly," meaning the activity is done for "2/3 or more" of an eight-hour workday day. *See*

DOT 787.682-066, *Sewing Machine Operator I*, 1991 WL 681104. Joyce presented undisputed

evidence that her work as a tobacco picker involved reaching for eight hours a day, five days a

week. R. 287. Thus, almost any limitation on Joyce's ability to reach would eliminate two of the

ALJ's three reasons for concluding that she was not disabled. The ALJ's third reason relied on

the VE's testimony that Joyce could have been a tobacco picker as that job is generally

performed. R. 25 (citing R. 46–49). The VE testified that most tobacco-picker jobs require

"frequent reaching," R. 56, meaning that Joyce would need to reach "from 1/3 to 2/3 of the

time," DOT 521.687-098, *Picker*, 1991 WL 674229. As explained, this ALJ's sole reason for

rejecting PA Jackson's medical opinion indicating that Joyce may have been further limited to

21

"occasional" reaching[9] is contradicted by PA Jackson's undisputed observations that Joyce had reduced range of motion with tenderness in both shoulders and tenderness to palpation of the muscles around her thoracic spine. Accordingly, this Court cannot affirm the ALJ's denial of benefits upon any of the reasons she gave. *See generally Patterson v. Bowen*, 839 F.2d 221, 225 n.1 (4th Cir. 1988) ("We must . . . affirm the ALJ's decision only upon the reasons he gave.").

B.    *Joyce's Activities of Daily Living*

Joyce argues that the ALJ "ignored evidence" about her "minimal" daily activities.[10] Pl.'s Br. 10–11. ALJs should consider relevant information about a claimant's activities of daily living ("ADLs") as one factor in determining her RFC. *See* 20 C.F.R. §§ 416.929(c)(3)(i), 416.945(a). However, "[a]n ALJ may not consider the *type* of a claimant's activities without also considering the *extent* to which she can perform them." *Woods*, 888 F.3d at 694. If an ALJ rejects statements describing the limited extent of the claimant's activities, her decision must build an accurate and logical bridge from other relevant evidence in the record to her conclusion that the qualifying statements are not credible. *See Monroe*, 826 F.3d at 189. Additionally, the Fourth Circuit has long "bemoaned the tendency of ALJs to overstate claimants' [RFCs] and ability to work based on their daily activities." *Oakes*, 70 F.4th at 216 (cleaned up). "A claimant's inability to sustain full-time work due to pain and other symptoms is often consistent with her ability to carry out

---

[9] As noted, PA Jackson's medical opinion does not define the terms "frequently" and "occasionally." *See* R. 651–52. On remand, the ALJ will use the Commissioner's definitions of those terms when assessing Joyce's ability to use her upper extremities to sustain work-related functions on a regular and continuing basis. *See* SSR 83-10, 1983 WL 31251, at *5–6.

[10] Joyce argues that this ALJ relied on her daily activities, R. 17, to support her conclusion that Joyce's statements describing "the persistence, intensity, and functionally limiting effects of [her] symptoms [were] not entirely consistent with the medical and other evidence in the record," R. 22. *See* Pl.'s Br. 10–11. The ALJ did not mention activities of daily living, R. 17, when analyzing Joyce's symptoms, R. 22. She merely concluded that Joyce's "daily activities" were one category of evidence that "supported" her RFC finding. R. 24.

daily activities" at home. *Arakas*, 983 F.3d at 101. "The critical differences between activities of daily living and activities in a full-time job are that a person has more flexibility in scheduling the former than the latter, can get help from other persons, and is not held to a minimum standard of performance, as she would be by an employer." *Id.* (cleaned up) (quoting *Bjornson v. Astrue*, 671 F.3d 640, 647 (7th Cir. 2012)). Thus, ALJs typically cannot rely on the claimant's ADLs alone to show that she could sustain full-time work. *See* 20 C.F.R. § 416.972(c).

\*

Joyce completed two Adult Function Reports supporting her SSI claim. *See* R. 292–99 (Aug. 2020) (Ex. D4E); R. 324–31 (May 2021) (Ex. D8E). She reported that she lived in an apartment by herself, without any pets. R. 292–93, 324–25. She had "no problems" tending to her personal care, including bathing, dressing, shaving, feeding herself, and using the toilet. R. 293; *see also* R. 325. She could drive, pay bills, count change, handle a savings account, and use a checkbook or money orders. R. 295, 327. She went to the grocery store about twice a month to shop for food and paper products. *See id.* Otherwise, she did not leave the house except to go to doctors' appointments. R. 296–97, 327–28. On a typical day, Joyce would wake up, make a cup of coffee and bowl of cereal and "maybe get dressed." R. 292; *see* R. 325. Most of the time she just read or watched television. R. 292, 296, 328. She might straighten the bed covers or wash her clothes, but those chores could take "all day" to complete. R. 294. In May 2021, Joyce reported that she could "wash a couple of dishes" and "lightly" sweep and mop the floors in her apartment. *See* R. 326. She did the dishes once a day, swept twice a week, and mopped the bathroom and kitchen once a week. *Id.* In April 2020, Joyce's doctor prescribed a boot to support her right foot. R. 298, 330. She wore it as often as needed. *See id.*

\*\*

ALJ Munday concluded that her RFC finding for light work, R. 16, was "supported by [Joyce's] reported symptoms, limitations, and daily activities" as well as the medical evidence generally, R. 24. She discussed Joyce's "daily activities" only once in her decision, R. 17, right after summarizing Joyce's sworn statements describing allegedly disabling symptoms and related physical limitations, *id.* (citing R. 292–99, 324–31). She found that Joyce did these activities: tends to her personal care without help; "mops and sweeps her kitchen once a week"; and "cleans dishes every day, drives, and manages her own finances." *Id.* (citing R. 292–99, 324–31). At the end of the RFC determination, the ALJ concluded that Joyce's "daily activities" and other broad categories of evidence in the record "supported" her own RFC finding. R. 24.

But the ALJ never explained how Joyce's ability to get dressed and feed herself, wash dishes, drive, and mop or sweep her apartment twice a week showed that she could actually perform the tasks required by light work, such as lifting up to twenty pounds and stand and/or walking for six hours during an eight-hour day. *See Woods*, 888 F.3d at 694. She "merely stated in a conclusory manner that [those] activities," *Arakas*, 983 F.3d at 100, supported her RFC finding, R. 24. Nor did the ALJ acknowledge Joyce's statements describing the very limited extent to which she did these activities. *See Woods*, 888 F.3d at 694. Joyce reported that she washed "a couple of dishes" once a day and did some "light" sweeping or mopping once or twice a week. She rarely needed to drive because she did not leave home except to go to the grocery store (twice a month) and doctors' appointments. R. 295–97, 327–28. Even if the ALJ had considered those statements, "an ALJ errs in extrapolating from daily and life activities that a claimant has increased residual functional capacity, or, in other words, has the ability to do sustained work-related activities" on that basis in a competitive workplace. *Oakes*, 70 F.4th at 216. The Commissioner should remedy this error on remand.

C.    *Joyce's Symptoms*

Finally, Joyce challenges the ALJ's reasons for finding that her statements describing the intensity, persistence, and physically limiting effects of her symptoms were not entirely consistent with the medical and other evidence in her record. *See* Pl.'s Br. 11–13 (citing R. 22).

In statements to the agency, Joyce explained how chronic lower-back pain and neuropathy reduced her abilities to lift, sit, stand, walk, and balance. *See* R. 43, 292, 297, 324–25, 329. She estimated that she could lift at most five pounds, R. 297, 329; sit for at most twenty minutes, R. 329; stand for "maybe" five to ten minutes, R. 297, 329; walk about twenty-five feet before needing to rest for five minutes, R. 297; and walk less than a quarter mile all day, R. 329. Trying to lift a gallon of water caused "a lot of pain" in her back. R. 43. She could not walk without feeling "off balance," R. 325, and she climbed stairs "sideways" rather than straight on, R. 297. Sometimes she needed to hold on to the wall just to keep from falling. R. 43. Joyce described similar symptoms and functional limitations at medical visits throughout the relevant time. *See, e.g.*, R. 647 (PA Jackson noting Joyce's report that she had pain "consistently in her upper thoracic spine and left lower back," she had "fallen a couple of times" from "lack of balance," and "it is difficult to take the stairs in her home due to pain"); R. 666, 674, 918 (neurologist Victor Owusu-Yaw, M.D., noting Joyce's reports that "lifting anything heavier than a gallon of milk" causes pain, "she cannot stand for longer than a few minutes without increased pain in her back," and "she has fallen and had many near falls [because her] legs are weak [and] give out"); R. 685 (pain management specialist John Dailey, M.D., noting Joyce's reports that her severe lower back pain with radicular "symptoms are aggravated by prolonged standing and prolonged sitting").

The ALJ summarized some of this evidence in her decision. R. 17; *see also* R. 18–22. She found that Joyce's severe MDIs, namely "mild" chronic bilateral L5 radiculopathy and lumbar DDD, R. 15, could reasonably be expected to cause the kind and degree of symptoms that Joyce described, R. 22. *See generally* 20 C.F.R. § 416.929(b); *Craig v. Chater*, 76 F.3d 585, 591 (4th Cir. 1996). However, she concluded that Joyce's "complaints of disabling pain" and extreme balance problems were "not entirely consistent" with the record. R. 22; *see* R. 17 ("[T]he evidence does not support disabling levels of pain or immobility."). She gave two reasons for discounting Joyce's statements. R. 22. First, the objective medical evidence showed that, "most of the time, she exhibit[ed] normal mobility without pain or neurological deficits." R. 22 (citing R. 538, 649–52, 667–68, 671–72, 676, 685–86, 919–20). Second, Joyce admitted she had "responded well to conservative treatment interventions including Lyrica, meloxicam, and epidural steroid injections." *Id.* (citing R. 658–59, 667–68, 671–72, 674–76, 682–83, 918–21).

The cited medical records do show that Joyce did not have any neurological deficits and usually walked with a normal gait. *Compare* R. 649, 676, *and* 689 (abnormal gait), *with* R. 538, 668, 672, *and* 920 (normal gait). But, these and other exam notes also show that Joyce exhibited different "obvious pain behaviors," R. 22, that tend to support her statements describing severe back pain and decreased mobility. In May 2021, for example, Joyce "move[d] very poorly" while walking on exam. R. 689. She was "very rigid in her spine with poor mobility" and endorsed "pain with motion." *Id.* Several providers recorded positive straight-leg raise tests, R.651, 686, pain and decreased range of motion in the lumbar spine, R. 686, and tenderness to palpation of the thoracic and lumbar paraspinal muscles, R. 469, 651, 686. The ALJ did not explain how she considered any of these abnormalities when concluding that Joyce's symptoms

were not entirely consistent with the objective medical evidence, R. 22. *See generally Arakas*, 983 F.3d at 98; 20 C.F.R. § 416.929(c)(2).

The cited records do not support the ALJ's finding that Joyce's back pain and radicular symptoms "responded well to conservative treatment" including meloxicam and epidural steroid injections. R. 22. In May 2021, pain management specialist Mark Hermann, M.D., opined that recent imaging showed "fairly severe spinal stenosis at L4-5," "some foraminal stenosis more severe on the right L4-5 also involving L2-3," and "advanced degenerative spondylosis . . . with listhesis at L4-5." R. 689. From his perspective, Joyce's "very severe" back pain and radicular symptoms had "been pretty much [u]ntreated" until this point. *Id.* He started Joyce on meloxicam, gave her a corticosteroid shot, and referred her to both physical therapy and to his colleague James Dailey, M.D., for interforminal steroid (epidural) injections. *Id.* Dr. Dailey noted that Joyce's symptoms had "not responded to 6 weeks of conservative management," including medications. R. 686. In June, Joyce told Dr. Hermann that she "saw slight to minimal" improvement with physical therapy and the meloxicam was helping "somewhat." R. 683. Dr. Hermann opined that they had "exhausted general orthopedic care." R. 684. He recommended Joyce see a spine specialist after she had the epidural, which Dr. Daily was scheduled to perform the following week. *See* R. 683–84. There is no indication that Joyce received an epidural steroid injection, *see* R. 682, 690–94, and the ALJ did not cite any specific evidence to support her finding that Joyce reported her symptoms "responded well" to that intervention. R. 22. Accordingly, she failed to build an accurate and logical bridge from the evidence she relied upon to her conclusion that Joyce's statements describing disabling pain and limited mobility were not entirely credible. *See Monroe*, 826 F.3d at 189.

IV. Conclusion

27

For the foregoing reasons, I find that the ALJ's decision is not supported by substantial evidence. I respectfully recommend that the presiding District Judge **GRANT** Joyce's motion for summary judgment, ECF No. 15; **DENY** the Commissioner's motion for summary judgment, ECF No. 18; **REVERSE** the Commissioner's final decision dated May 11, 2022, and **REMAND** the matter for rehearing under the fourth sentence of 42 U.S.C. § 405(g); and **DISMISS** this case from the Court's active docket.

### Notice to Parties

Notice is hereby given to the parties of the provisions of 28 U.S.C. § 636(b)(1)(C):

Within fourteen days after being served with a copy [of this Report and Recommendation], any party may serve and file written objections to such proposed findings and recommendations as provided by rules of court. A judge of the court shall make a de novo determination of those portions of the report or specified proposed findings or recommendations to which objection is made. A judge of the court may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge. The judge may also receive further evidence or recommit the matter to the magistrate judge with instructions.

Failure to file timely written objections to these proposed findings and recommendations within 14 days could waive appellate review. At the conclusion of the 14-day period, the Clerk is directed to transmit the record in this matter to the presiding District Judge.

The Clerk shall serve certified copies of this Report and Recommendation on all counsel of record.

ENTER: February 26, 2024

Joel C. Hoppe
United States Magistrate Judge

28